United States Court of Appeals
Fifth Circuit

**F I L E D**

February 22, 2005

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 04-30003

CURTIS CALLAIS WELDING, INC.,

Plaintiff-Appellant,

versus

STOLT COMEX SEAWAY
HOLDINGS, INC.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana
(02-CV-3595)

Before JONES, SMITH, and STEWART, Circuit Judges.

PER CURIAM:[*]

This is a suit for contractual defense and indemnification by Curtis Callais Welding, Inc.

("Callais Welding") against Stolt Comex Seaway Holdings, Inc. ("Stolt Holdings"). This suit arose

following Brian Laine's filing of a negligence claim in a Louisiana court against the president of

Callais Welding, Curtis Callais, Sr. ("Curtis, Sr."), in his individual capacity. Laine filed the state

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

court suit after sustaining serious injuries during the course and scope of his employment with Big Inch Marine Systems, Inc. ("Big Inch"), a subsidiary of Stolt Offshore.

Callais Welding, the plaintiff-appellant, now appeals from the decision of the district court granting a cross-motion for summary judgment in favor of Stolt Holdings, the defendant-appellee. On appeal, Callais Welding asserts ten claims of error. Notwithstanding, the single dispositive issue is whether the district court erred in enforcing the choice-of-law provision in the Master Service Agreement ("service agreement")[1] between Callais Welding and Stolt Offshore. If the district court was correct in enforcing the choice-of-law provision, we need not address Callais Welding's other claims of error. Under general maritime law, the terms of the service agreement must be construed narrowly. The application of maritime law led to the district court's conclusion that Stolt Offshore was only required to defend and indemnify Callais Welding, the entity, not its employees and affiliates. Because we find that the district court was correct in enforcing the choice-of-law provision in the service agreement and in properly interpreting the provisions therein, the order of summary judgment in favor of Stolt Holdings is hereby AFFIRMED.[2]

---

[1] "A master service agreement is a blanket contract (whether or not so labeled) which covers any kind of work the independent contractor might be requested to perform for the principal and which renews automatically or continues in effect until either party gives notice of termination." Stoot v. Fluor Drilling Serv., Inc., 851 F.2d 1514, 1519 (5th Cir. 1988).

[2] Stolt Comex Seaway Holdings, Inc. is an affiliate of Stolt Offshore, Inc. ("Stolt Offshore"). Although Stolt Holdings was named as the defendant in Callais Welding's suit for defense and indemnification, Stolt Offshore is the official parent company of Stolt Holdings. Moreover, it is not altogether clear from the record why Callais Welding sued the affiliate company instead of the parent company.

## BACKGROUND

A. The Service Agreement

Callais Welding is a Louisiana corporation with its principal place of business in Louisiana. Curtis, Sr. is the president and chief executive officer of Callais Welding. On September 15, 1995, Callais Welding entered into a Master Service Agreement with American Oilfield Divers, Inc. ("American Oilfield"). As the president and CEO, Curtis, Sr. was a signatory to the agreement, acting as the entity's agent. At the time the service agreement was executed, American Oilfield was also a foreign corporation, with its principal place of business in Louisiana.[3]

The district court found that the provisions under the service agreement required Callais Welding to provide services and equipment to American Oilfield for American Oilfield's offshore drilling and production business. The service agreement also contained a choice-of-law provision which provided that, if a dispute between any of the parties arose concerning the service agreement, then general maritime law would be used to resolve the disagreement.

Prior to the incident giving rise to this suit, American Oilfield became Stolt Offshore. As a result of the change, the service agreement was amended. The amendment provided that Stolt Offshore, American Oilfield's successor in interest, and all of Stolt Offshore's subsidiaries and affiliates, including Stolt Holdings, would become signatories to the original service agreement between Callais Welding and American Oilfield. As it pertains to this dispute, the district court found that the service agreement required Callais Welding to defend and indemnify Stolt Offshore in the

---

[3] Through acquisition and name change, American Oilfield became Stolt Offshore. For the purposes of diversity, the district court determined that by the time Callais Welding filed this suit for defense and indemnification, Stolt Offshore had pulled its charter from Louisiana and thereby severing any nexus to Louisiana.

3

event that claims were brought by Callais Welding against Stolt Offshore, its employees, affiliates or subsidiaries, or their employees.

Conversely, the service agreement was conspicuously <u>silent</u> as to whether Stolt Offshore would be required to defend and indemnify Callais Welding's <u>employees, subsidiaries or affiliates, and any of their employees</u>, if a suit was brought against Callais Welding by Stolt Offshore, its employees, subsidiaries or affiliates, or any of their employees. As a result of this silence, the district court concluded that the amendment required Stolt Offshore and its subsidiaries and affiliates to defend and indemnify only Callais Welding from suits brought by Stolt Offshore, its employees, subsidiaries or affiliates, or any of their employees.

### B. Underlying Facts and Proceedings

On August 31, 2001, while in the course and scope of his employ with Big Inch, another Stolt Offshore subsidiary, Brian Laine was injured at an <u>onshore</u> work site, in Houma, Louisiana. It can be gleaned from the record that, while Laine was inspecting a spool assembly, a crane that was lifting heavy objects capsized. As a result of the capsize, the heavy piece of tubing or piping being carried by the crane, i.e., the jumper, disconnected and fell onto the scaffolding where Laine was standing. The jumper struck Laine across his head and shoulders which resulted in Laine receiving severe injuries.

At the time of the accident, Curtis, Sr. was supervising the operation of the crane. Timothy Sutterfield, a supervisor for Triple C. Fabricators, Inc. ("Triple C"), another company working at the Houma site, was responsible for connecting the jumper assembly.[4]

---

[4] It should be noted that the record indicates that, at the time of the incident, Curtis, Sr. was the director and an officer of Triple C. He was also one of the two incorporators of Triple C.

4

On August 9, 2002, just prior to the filing of their petitions in state court, Laine and his wife, Kimberly Laine, entered into a Mary Carter settlement agreement ("settlement agreement") with the following parties concerning Laine's claims arising from the accident: (1) Big Inch, (2) Stolt Offshore, and (3) both Big Inch's and Stolt Offshore's insurers and underwriters. The settlement agreement provided that the Laines would receive $350,825, in exchange for a release of all their claims against Big Inch, Stolt Offshore and their insurers and underwriters.

The settlement agreement specifically allowed for the release of Stolt Offshore and Callais Welding, the entity, and further provided the Laines with the right to subrogate their claims and to reserve all their rights against any non-settling defendants. The Laines specifically excluded Triple C and Triple C's insurers and underwriters from the release agreement.

On August 30, 2002, Brian Laine, Kimberly Laine, and Big Inch all filed separate petitions for damages in the 32nd Judicial District Court, in the Parish of Terrebonne, Louisiana. The Laines named as defendants, Curtis, Sr., individually, Triple C and its insurer. The Laines did not name Callais Welding, the entity. The Laines' petitions alleged that Curtis, Sr. was liable for negligence because he ordered the use of an inappropriate crane to rig the jumper assembly. Their petitions alleged that Triple C was liable for negligence because Sutterfield, Triple C's employee, improperly connected the jumper assembly to the crane.

In response to the state court claims, Callais Welding requested Stolt Holdings to indemnify and defend it in the state court proceeding even though Callais Welding was never named a party to the state court suit. Callais Welding contended that Stolt Holdings, as Stolt Offshore's affiliate, was obligated to defend and indemnify it pursuant to the terms of the service agreement. Stolt Holdings, however, refused Callais Welding's request for protection, contending that Callais Welding was not

5

a party to the lawsuit. Stolt Holdings further argued that the Laines' lawsuits were brought against Curtis, Sr.–in his individual capacity–and also that it was only obligated to defend and indemnify Callais Welding, the entity, not the entity's agents or employees.

In response, Callais Welding filed this defense and indemnification suit against Stolt Holdings in the United States District Court for Eastern District of Louisiana. Callais Welding's complaint alleged that Stolt Holdings, as an affiliate of Stolt Offshore, breached its contractual obligation under the service agreement by failing to defend and indemnify Callais Welding in the state court proceeding.

On November 6, 2003, Callais Welding moved for summary judgment, contending there was no genuine issue of material fact as to whether Stolt Holdings was required to defend and indemnify Callais Welding, its employees, subsidiaries and affiliates, and any of their employees in the state court proceeding. Callais Welding essentially argued that although the language under the service agreement did not expressly expand Stolt Holdings' duty to Callais Welding's agents and employees, or further, it must be implied from the language of the service agreement that Stolt Offshore's duty to Callais Welding was more expansive.

In its answer, Stolt Holdings argued that there were genuine issues of material fact concerning Callais Welding's claim of entitlement to defense and indemnification of Callais Welding's agents and employees, particularly with regard to its duty to defend and indemnify Curtis, Sr. Stolt Holdings specifically contended that because the claims in the state court proceeding were brought against Curtis, Sr., in his individual capacity, and not against the Callais Welding, the entity, or against Curtis, Sr., as agent of the entity, the indemnity provision under the service agreement was not triggered. Stolt Holdings, therefore, argued that it, as an affiliate of Stolt Offshore, had no duty to

6

protect Callais Welding from the claims raised against Curtis, Sr. in the state court proceeding. Stolt Holdings maintained that its only obligation under the service agreement was to Callais Welding, the entity.

On November, 18, 2003, Stolt Holdings filed a cross-motion for summary judgment, now contending that there was no genuine issue of material fact that Stolt Holdings was not contractually obligated to defend and indemnify Callais Welding, based on the plain language of the service agreement. Stolt Holdings further contended that, under rules of general maritime law, the terms of the service agreement and all the provisions therein had to be construed narrowly. If read narrowly, Stolt Holdings argued, the district court necessarily had to disallow coverage to Callais Welding's employees since the agreement did not specifically provide for coverage of them.

In considering the opposing motions, the district court determined that a conflict of laws dispute existed. Callais Welding contended that under the language of the service agreement the dispute between it and Stolt Holdings should be resolved under Louisiana law, and therefore, the doctrine of respondeat superior should be applied. Callais Welding principally relied on Reliance Ins. Co. v. Bernard & Burke, Inc. 428 So. 2d 1097 (La. App. 1 Cir. 1983) (observing that indemnity agreements will cover an entity's employees regardless of whether provisions in the contractual agreement specifically provide for coverage of the entity's agents, employees, or officers), for the proposition that an entity can only be liable through its agents or employees. 428 So. 2d at 1102.

Stolt Holdings conversely argued that the language under the service agreement required the dispute to be resolved pursuant to general maritime law because the choice-of-law provision under the service agreement specifically required the parties to do so. To resolve the matter, the court interpreted the following pertinent language of the agreement:

7

6. INDEMNIFICATION (a) For purposes of this Agreement, the term "Company Indemnities" shall mean [Stolt Holdings] and all of its affiliated or parent or subsidiary companies or corporations (including, without limitation, the subsidiary signatories to this Agreement and all of the aforesaid entities' agents, officers, directors, employees, representatives and insurers, and all of the aforesaid entities' customers for whom Services under this Agreement are directly or indirectly provided during the term of this Agreement.

(b) CONTRACTOR'S Indemnification. Contractor assumes sole responsibility for and shall protect, defend, indemnify and hold the Company Indemnities harmless from and against any an all loss, damage, injury, liability, . . .

. . . .

(d) COMPANY'S Indemnification. Except as expressly set forth in Sections 6(a) through (c) above, the COMPANY [Stolt Holdings] assumes sole responsibility for and shall protect, defend, indemnify and hold CONTRACTOR [Callais Welding] harmless from and against any and all Losses arising out of, connected with . . . any injury, . . . to the COMPANY's [Stolt Holdings] employees and personnel or for loss of and/or damages to COMPANY'S [Stolt Holdings] property, vessels or equipment, by whomever brought, whether based on statute, tort, contract or quasi contract, and whether or not resulting from the contractual obligations assumed by the CONTRACTOR [Callais Welding]. Except as set forth in Sections 6(a) through (c) above, such indemnity shall apply whether or not the CONTRACTOR [Callais Welding] was or is claimed to be passively, concurrently or actively negligent or expressly negligent and regardless whether liability without fault (including but not limited to claims for unseaworthiness of vessels) is imposed or sought to be imposed on the CONTRACTOR [Callais Welding].

On December 15, 2003, the district court found that the choice-of-law provision in the agreement was valid and enforceable. Because the court determined that the application of general maritime law was not contrary to Louisiana's public policy, it thereby gave effect to the choice-of-law provision, thus obligating the parties to resolve the matter under general maritime law. The district court applied the rules under general maritime law, and consequently, interpreted the language under the agreement in favor of Stolt Holdings. The court relied on this court's prior holding in Babcock v. Continental Oil Co., wherein we stated that under general maritime law an indemnity

8

clause in a contract is to be interpreted narrowly and that the words of the contract are to be given their plain meaning. 792 F.2d 1346 n.5 (5th Cir. 1986).

Based on Babcock, the district court concluded that the plain language of the service agreement provided that Stolt Offshore, and thereby Stolt Holdings, was obligated to defend and indemnify only Callais Welding, not Callais Welding's agents or employees, including Curtis, Sr. Because Callais Welding was not a party to the state court proceeding, the court concluded that Stolt Holdings was not obligated to defend or indemnify Curtis, Sr. For this reason, the court granted Stolt Holdings' cross-motion for summary judgment and issued a memorandum of order and reasons to explain its decision. This appeal by Callais Welding ensued.

On appeal, Callais Welding contends that, at the time of the accident, Curtis, Sr. was in the course and scope of his employ for Callais Welding. Based on this contention, Callais Welding argues that Curtis, Sr. is covered for the negligence claims filed against him in the state court proceeding because Curtis, Sr. was acting as an agent or employee of Callais Welding.

Stolt Holdings conversely argues that Curtis, Sr. was working in his individual capacity, or, that he was in the course and scope of his employ for Triple C. Moreover, Stolt Holdings contends that under the plain language of the service agreement its duty to defend and indemnify only extended to Callais Welding, not its agents or employees. Based on this argument, Stolt Holdings maintains that the indemnity provision in the service agreement was never triggered because Callais Welding was never named a party to the state court suit, and further, was specifically released from any liability by the settlement agreement.

**JURISDICTION**

Although the district court properly concluded that the service agreement was not a maritime contract, the court nevertheless determined that diversity jurisdiction existed because at the time that Callais Welding filed this lawsuit, Stolt Holdings was a foreign corporation with its principal place of business outside the state of Louisiana. The court also noted that Callais Welding admitted in its complaint that diversity jurisdiction existed. We find no error. Also, we have jurisdiction over this matter pursuant to 28 U.S.C. § 1291, as this appeal is from a final judgment of the district court.

**STANDARD OF REVIEW**

We review de novo a district court's grant of a motion for summary judgment, applying the same standard as the district court did in the first instance. See Burge v. Parish of St. Tammany, 187 F.3d 452, 465 (5th Cir. 1999). Summary judgment is appropriate where the moving party establishes "there is no genuine issue of material fact and that [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden. Celotex v. Catrett, 477 U.S. 317, 327 (1986).

Once the moving party has carried its summary judgment burden, the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). This showing requires more than some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584-86 (1986).

**DISCUSSION**

Concluding that the district court correctly gave effect to the choice-of-law provision in the service agreement, we accordingly apply the rules of contract interpretation under general maritime law to construe the meaning of the service agreement. The question becomes whether the service agreement can–under general maritime law–be construed to require Stolt Holdings to indemnify Curtis, Sr. on the basis that he is an employee of Callais Welding. Because we do not answer this question in the affirmative, we hold that the district court's order of summary judgment in favor of Stolt Holdings was proper.

1. Conflict of Laws

Since the parties continue to dispute the validity of choice-of-law provision, we first address the conflict of laws dispute.

In a federal diversity case, the conflict of laws of the forum state governs.[5] Roberts v. Energy Dev. Corp., 104 F.3d 782, 786 (5th Cir. 1997). The rules governing Louisiana's conflict of laws are delineated under Louisiana Civil Code Articles 3540,[6] 3537,[7] and 3515.[8] "Louisiana generally

---

[5] Callais Welding cites to Reliance Ins. Co., supra, for the proposition that there is no conflict of laws between Louisiana law and general maritime law because under the doctrine of respondeat superior, an entity can only be liable through its agents or employees. We reject this argument based on prior precedent in Babcock, discussed infra.

[6] Article 3540 states as follows:

> All other issues of conventional obligations [, i.e., contracts] are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

[7] Article 3537 reads as follows:

> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved state in light of: (1) the pertinent contracts of each

11

allows parties to select the law that will determine the outcome of the disputes arising from a contract." Verdine v. Ensco Offshore Co., 255 F.3d 246, 250 (5th Cir. 2001). Thus, Louisiana has no general prohibition against choice-of-law provisions. Indeed, under Article 3540 a choice-of-law provision is presumed valid and enforceable, until the provision is proven invalid. Delhomme Indus., Inc. v. Houston Beechcraft, Inc., 669 F.2d 1049, 1058 (5th Cir. 1982); Cherokee Pump & Equip., Inc. v. Aurora Pump, 38 F.3d 246, 250 (5th Cir. 1994) (stating that Article 3540 "generally gives contracting parties the freedom to choose which state's laws will govern disputes arising out of the contract").

Under article 3540, Louisiana courts typically will not invalidate a choice-of-law provision agreed upon between parties, unless the chosen law violates a strong public policy of the state. See Delhomme, 669 F.2d at 1058 (citing Wilson v. Sawyer, 106 So. 2d 831, 833 (La. Ct. App. 1958)); see also Roberts v. Energy Dev. Corp., 235 F.3d 935, 938 (5th Cir. 2000). Cf. Matte v. Zapata

state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

[8] Article 3515 reads as follows:

Except as otherwise provided in this Book, an issue in a case having contracts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Offshore Co., 784 F.2d 628, 631 (5th Cir. 1986) (refusing to give effect to a choice-of-law provision as a violation of Louisiana public policy because the parties attempted to contract around Louisiana Oilfield Indemnification Act ("LOIA")). The party seeking to invalidate the choice-of-law provision bears the burden of proving invalidity. Delhomme Indus., Inc., 669 F.2d at 1058. Moreover, "[o]ne state's law does not violate another state's public policy merely because the law of the two states differ." Id. (citing Restatement (Second) of Conflict of Laws § 90 comment b (1969)); see also Cherokee Pump & Equip., Inc. 38 F.3d at 252.

The provisions under Article 3537 essentially guide us in determining which of the competing laws, here federal maritime law or Louisiana general contract laws, is applicable, and Article 3515 guides courts in balancing the policies of the competing laws.

As the district court correctly concluded, but for the choice-of-law provision in the service agreement, it is clear that Louisiana's law would apply.[9] In addition, because Curtis, Sr.'s work was performed entirely on land, there is no need for concern that application of the choice-of-law provision will contravene any national interest in maintaining uniformity of maritime laws. See Foremost Ins. Co. v. Richardson, 457 U.S. 668 (1982); see also Green v. Vermillion Corp., 144 F.3d 332, 341 (5th 1998) (instructing that one of the fundamental premises of admiralty jurisdiction is that "uniformity is not to be sacrificed to accommodate state law") (citing Grant Gilmore Charles L. Black, Jr., The Law Admiralty § 6-58 to § 6-61 (2d Ed. 1975)); Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 5th Cir. Unit A Aug. 1981) (observing that a party's contract to indemnify an indemnitee against the consequences of his own negligence does not violate any fundamental policy

_____

[9] Louisiana is the only state whose policies could be impaired by enforcement of the choice-of-law provision in the defense and indemnity clauses of this service agreement and all of the injuries and transaction took place in Louisiana.

13

of maritime law); but cf. Stoot, 851 F.2d at 1518 (stating that "application of the [Louisiana Oilfield] Anti-Indemnity Statute does not conflict with any fundamental purpose of maritime law"). All that is required in order to not violate admiralty jurisdiction is that "the contract clearly express[] such an obligation in unequivocal terms." Corbitt, 654 F.2d at 333. Because we conclude that the indemnity clause under the service agreement is unambiguous and unequivocal as to the intent of the parties, Article 3537 is not at issue for this analysis.

The question becomes whether the choice-of-law provision violates a strong public policy of Louisiana. "Louisiana contract law generally 'allows a principal to be indemnified against his own negligence so long as that intent is clearly expressed.'" Verdine, 255 F.3d at 250 (quoting Rodrigue v. LeGros, 563 So. 2d 248, 254 (La. 1990). Notwithstanding, "[t]he [Louisiana] Oilfield Anti-Indemnity Act [("LOIA")]creates a public policy exception to the general rule." Id.; LA. REV. STAT. 9:2780. "The Louisiana legislature adopted the act to eliminate defense and indemnity provisions forced on Louisiana oilfield contractors." Id. at 250. Thus, if LOIA applies to the provisions in this service agreement, the indemnity agreement must be invalidated as being in contravention of Louisiana's public policy.

Notwithstanding this exception, however, a panel of this court in Transcontinental Gas Pipe Line Corp. v. Transp. Ins. Co., specifically limited the scope of LOIA's application. 953 F.2d 985, 991 (5th Cir. 1992); see also Verdine, 255 F.3d at 251. To determine whether the provisions of LOIA were applicable, the court fashioned a two-part inquiry:

> First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, [i.e.,] examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water"... Therefore, if (but only if) the agreement (1) pertains to a well *and* (2) is related to

14

exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.

Transcon. Gas Pipe Line Corp., 953 F.2d at 991; accord Fontenot v. Chevron U.S.A., Inc., 676 So. 2d 557, 564 (La. 1996) (adopting the two-part test articulated in Transcontinental).

We have carefully reviewed the language under the service agreement at issue and do not find that it pertains to an oil, gas, or water well. Accordingly, our inquiry concerning LOIA ends. Moreover, Callais Welding's dependence on Reliance for the proposition that a maritime contract in Louisiana must extend coverage to a company's agents and employees, even when the agreement does not expressly provide for such coverage, is of no avail. While it is true that the district court's ruling under the holding in Reliance would be contrary to Louisiana's public policy, the holding in Reliance, as the district court noted, is not public policy. Reliance is merely Louisiana law that differs from general maritime law with regard to how interpretation of indemnity should be done. As Judge Alvin Rubin so aptly noted in Delhomme Indus., Inc., one set of laws "does not violate another state's public policy merely because the [competing] laws . . . differ." 669 F.2d at 1058. Because Callais Welding's argument that the indemnity agreement contravenes Louisiana public policy, principally relies on the holding in Reliance, we find that Callais Welding has not met its burden sufficient to invalidate the choice-of-law provision. As such, we move on to address the substantive issues of coverage as set out under the service agreement.

2. Interpretation of the Service Agreement

The district court determined that this court's prior decision in Babcock was dispositive of the issues of coverage in this dispute. We agree.

"A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, . . ." Corbitt, 654 F.2d

15

at 333. This court has consistently held that when interpreting a contract under general maritime law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." Id. at 332-33 (citing Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817, 825 (5th Cir. 1975)); see also Fontenot v. Mesa Petroleum, 791 F.2d 1207, 1214 (5th Cir. 1986). This court cannot look to extrinsic or parol evidence to construe the intent of the parties. Corbitt, 654 F.2d at 333. Moreover, the contract must be read as a whole and the words must be given their plain meaning.

In Babcock, this court addressed a dispute concerning an indemnity provision that was strikingly similar to the one in the instant case. 792 F.2d at 1349-51. The panel in that case held that the indemnification agreement between a company and a contractor did not entitle the contractor's employees to indemnification for personal injury claims because the agreement did not expressly provide for coverage of the contractor's agents or employees, even though it expressly provided for coverage of the company's agents and employees. Id. at 1350-51. Moreover, the panel rejected arguments that failing to extend coverage to the entity's agents and employees where the agreement did not expressly do so would result in a "ludicrous result" on the basis that "an agreement to indemnify an employer without indemnifying its employees is meaningless." Id. at 1351.

Like the district court, we find that the language of the service agreement is unambiguous. We, therefore, need not look beyond the plain language of the service agreement to determine the intent of the parties. Thus, our task becomes to discern whether, under the plain language of the service agreement, the agreement can be construed to expand Stolt Holding's duty of defense and indemnification to Callais Welding's agents or employees, or further. We are restrained by controlling precedent to read narrowly the provision under this agreement. After careful review, we

16

conclude that the service agreement in this case cannot be read to expand coverage beyond the scope of Callais Welding.

Section 6(a) of the agreement expressly states Stolt Offshore is inclusive of all of its "affiliated or parent or subsidiary companies [, including Stolt Holdings,] . . . and all of the aforesaid entities' agents, officers, directors, employees. . . ." There is no such provision stating that the definition of Callais Welding is similarly expansive.

Likewise, section 6(b) of the service agreement calls for Callais Welding to defend and indemnify Stolt Offshore, as understood in section 6(a). It is clear from the plain language that section 6(a) intended to expand the meaning of Stolt Offshore beyond the mere limits of the entity. Yet, section 6(d) of the service agreement, delineating the obligations between the parties, cannot be read to suggests that the parties intended Stolt Offshore's duty of defense and indemnification was to expand beyond the limits of Callais Welding, the entity.

This court has previously stated that "[a] contract to indemnify another for his own negligence imposes an extraordinary obligation . . . [and that] an indemnitor [, here Stolt Offshore,] is entitled to express notice that under [its] agreement, and through no fault of [its] own, [it] may be called upon to pay damages caused solely by the negligence of [its] indemnitee. Corbitt, 654 F.2d at 333. This service agreement clearly does not provide Stolt Offshore with express notice that it will be called upon to defend and indemnify Callais Welding's agents or employees or its affiliates or subsidiaries. We find it highly persuasive of the parties' intent that one portion of the service agreement expressly includes coverage for Stolt Offshore's agents, employees, subsidiaries and affiliates, and yet, the other portion of the agreement remains conspicuously silent with regards to a more expansive duty of coverage to Callais Welding. Thus, it is clear from our reading of the plain

17

language of the service agreement that the parties did not intend for Stolt Offshore's duty of defense and indemnification to expand beyond the coverage of Callais Welding, the entity. Curtis, Sr., in his individual capacity, or as agent to the entity, is not covered under this service agreement.[10] Callais Welding's argument that the district court's granting of Stolt Holdings' cross-motion for summary judgment was improper is therefore without merit.

## CONCLUSION

Because we conclude that the district court's granting of Stolt Holdings' cross-motion for summary judgment was proper, the final judgment and order dismissing Callais Welding's claims against Stolt Holdings are therefore affirmed.

AFFIRMED.

---

[10] Although the record is not clear whether Triple C is an affiliate or subsidiary of Callais Welding, we for the same reasons hold that Triple C is not covered under the plain language of the service agreement.